19 F.3d 28
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
PROTECTIVE NATIONAL INSURANCE COMPANY OF OMAHA,
Plaintiff-Appellee-Cross-Appellant,
v.
SAFETY NATIONAL CASUALTY CORPORATION,
Defendant-Appellant-Cross-Appellee.
 Nos. 92-56163, 93-55015.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 2, 1994.
Decided Feb. 18, 1994.
 
 Before: D.W. NELSON, REINHARDT, and BRUNETTI, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 This case involves a contract dispute between two insurance companies, Protective National Insurance Company of Omaha ("Protective") and Safety National Casualty Corporation ("Safety"). Both companies provide coverage to the insured corporation, Pedus Security Services ("Pedus"). Protective argues that Safety is liable for $126,151.70 in defense costs that were incurred in defending Pedus against a wrongful death action. Safety, on the other hand, argues that Protective is liable for the defense costs.
 
 
 3
 The district court held that Safety was liable for the $126,151.70 in defense costs and granted summary judgment in Protective's favor. However, the court refused to require Safety to pay the prejudgment interest that had accrued on the defense costs. Safety appeals the judgment of the court on the defense costs issue. Protective cross-appeals the judgment of the court on the prejudgment interest issue.
 
 
 4
 We affirm the judgment of the court on the defense costs issue. We reverse the judgment of the court on the interest issue, however, and remand the case to the district court for a proper calculation of interest.
 
 I.
 
 5
 This case arose from the shooting death of Albert Kam, who was wrongfully killed by a security officer for Pedus Security Services ("Pedus") at Fisherman's Village in Marina Del Rey. Prior to Kam's death, Pedus had purchased two insurance policies to cover itself for liability arising from such incidents. First, Pedus had purchased a primary general liability insurance policy from Protective National Insurance Company ("Protective") for $500,000 of coverage.[1] Second, Pedus had purchased an excess insurance policy from Safety National Casualty Corporation ("Safety") for an additional $500,000 of insurance coverage.[2]
 
 
 6
 After several unsuccessful attempts to settle the matter, Kam's wrongful death action against Pedus was tried before a jury. The jury returned a verdict against Pedus for $484,627.00. Protective ultimately settled the suit on behalf of Pedus for a payment of $500,000.00 to Patricia Kam, the deceased's wife.[3] In addition to the cost of the agreed settlement, Protective incurred $126,151.70 in defending the action on behalf of Pedus. Thus, Protective incurred a total of $626,151.70, of which $126,151.70 was in excess of the primary policy limit of $500,000.00. When Protective sought reimbursement for the excess amount from Safety, Safety refused.
 
 
 7
 Protective brought this diversity action against Safety, seeking reimbursement of the defense costs of $126,151.70. The district court granted Protective's motion for summary judgment. However, the district court refused to require Safety to pay prejudgment interest that had accrued on the defense costs. Safety appeals on the defense costs issue. Protective cross-appeals on the prejudgment interest issue.
 
 II.
 
 8
 We review questions of contractual interpretation de novo. Aetna Casualty & Sur. Co. v. Pintlar Corp., 948 F.2d 1507, 1511 (9th Cir.1991). We review a district court's findings of fact under a clearly erroneous standard. Securities & Exchange Comm'n v. American Principals Holding, Inc., 962 F.2d 1402, 1405 (9th Cir.), cert. denied, 113 S.Ct. 210 (1992).
 
 III.
 
 9
 Safety appeals the summary judgment ruling of the district court, which held that it was liable for an excess amount of $126,151.70. Safety makes two arguments. First, it argues that it is not responsible for the defense costs under its definition of "ultimate net loss." Second, it argues that even if it were responsible for the defense costs under its definition of "ultimate net loss," Protective failed to obtain Safety's consent before incurring such costs. We reject both of Safety's arguments.
 
 A.
 
 10
 Safety first argues that it is not responsible for the defense costs under its definition of "ultimate net loss." The definition of "ultimate net loss" is central to the outcome of this case because Safety's duty to reimburse Protective is not triggered unless the "ultimate net loss" in a particular case exceeds $500,000.00.
 
 
 11
 Safety argues that its contract with Pedus defines "ultimate net loss" as excluding all "costs":
 
 
 12
 2. Ultimate Net Loss. The words "ultimate net loss" shall be understood to mean the sums paid in settlement of losses for which [Pedus] is liable after making deductions for all recoveries, salvages and other insurances (other than recoveries under the policies of the Primary Insurers), whether recoverable or not, and shall exclude all expenses and "costs."
 
 
 13
 According to Safety, the "ultimate net loss" in this case excludes the $126,151.70 in defense costs that were incurred on behalf of Pedus. Put differently, the "ultimate net loss" in this case equals only $500,000.00--not $626,151.70. Because the "ultimate net loss" does not exceed $500,000.00, Safety argues that it does not have to reimburse Protective.
 
 
 14
 Safety fails to recognize, however, that its own policy creates an exception to its argument that all "costs" are excluded from the calculation of "ultimate net loss." Under Safety's policy with Pedus, the term "costs" does not include any expenses for "retained counsel":
 
 
 15
 3. Costs. The word "costs" shall be understood to mean interest on judgments, investigation, adjustment and legal expenses (excluding, however, all expenses for salaried employees and retained counsel of and all office expenses of the Insured.)
 
 
 16
 Here, the contested amount of $126,151.70 was incurred precisely for retained counsel on Pedus' behalf. Accordingly, the contested amount is not the kind of "cost" that can be excluded from the calculation of "ultimate net loss." Thus, we conclude that the "ultimate net loss" in this case is $626,151.70 ($500,000.00 settlement plus $126,151.70 expenses for retained counsel)--not $500,000.00. Because the "ultimate net loss" in this case clearly exceeds $500,000.00, Safety's duty to reimburse Protective is triggered, and Safety is liable for the excess amount of $126,151.70.
 
 B.
 
 17
 Safety next argues that even though it might be liable for the excess amount under its definition of "ultimate net loss," Protective is not entitled to the excess amount because it never obtained Safety's written consent for the $126,151.70. Safety relies primarily on the following consent clause in its insurance policy with Pedus:
 
 
 18
 (a) In the event of claim or claims arising which appear likely to exceed the Primary Limit or Limits, no "Costs" shall be incurred by [Pedus] without the written consent of [Safety].
 
 
 19
 We reject Safety's argument. Safety's consent clause applies only to claims that "appear likely" to exceed the primary policy limit, which in this case was $626,151.70.[4] After thoroughly reviewing the relevant documents and after holding a hearing on the matter, the district court concluded that at no time did any claim in this case "appear likely" to exceed the primary policy limit.
 
 
 20
 Reviewing the district court's finding under a clearly erroneous standard, we cannot say that we are left with a "definite and firm conviction that a mistake has been committed." Concrete Pipe & Prods. v. Construction Laborers Pension Trust, 113 S.Ct. 2264, 2280 (1993). Virtually all of the costs were incurred prior to the time the jury brought back a verdict of approximately $484,000. (Shortly thereafter, in order to avoid post-judgment motions and appeals, Protective settled for $500,000.) The district court did not clearly err when it found that prior to the verdict Protective had no reason to believe that the amount that would be required to resolve the case (including costs) would exceed $500,000. Accordingly, we affirm the district court's conclusion that Safety's consent clause is not applicable to this case.
 
 IV.
 
 21
 Protective cross-appeals the district court's refusal to require Safety to pay prejudgment interest that had accrued on the $126,151.70 in defense costs. Safety counters Protective's claim with two arguments. First, Safety argues that it is not required to pay Protective prejudgment interest because Protective failed to file a timely "Motion to Alter or Amend the Judgment" within the meaning of Fed.R.Civ.Pro. 59(e). Second, Safety argues that even if it were required to pay prejudgment interest, it would only have to do so from the day that it refused to reimburse Protective--February 28, 1990. We reject both of Safety's arguments.
 
 A.
 
 22
 First, Safety argues that it is not required to pay Protective any prejudgment interest because Protective failed to file a timely "Motion to Alter or Amend the Judgment" within the meaning of Fed.R.Civ.Pro. 59(e).[5] We disagree. Protective did not have to comply with Rule 59(e) because its original complaint specifically included a request for prejudgment interest. In its original complaint, Protective asked for (among other things):
 
 
 23
 4. For prejudgment interest at the legal rate from March 21, 1989[.]
 
 
 24
 In its summary judgment ruling, the district court granted all of Protective's claims except for Protective's request for sanctions against Safety. In so doing, the district court implicitly granted Protective's request for prejudgment interest. Protective therefore did not have to file a motion to amend the judgment within the meaning of Rule 59(e).
 
 B.
 
 25
 Second, Safety argues that even if it were required to pay prejudgment interest, it would only have to do so from the day that it refused to reimburse Protective--February 28, 1990. We disagree. The Ninth Circuit has held that the prevailing party in a contract case is entitled to prejudgment interest under California law. Adams v. Johns-Manville Corp., 876 F.2d 702, 710 (9th Cir.1989). Specifically, prejudgment interest shall be awarded "from the day upon which the right to recover vested." James B. Lansing Sound, Inc. v. National Union Fire Ins. Co., 801 F.2d 1560, 1569 (9th Cir.1986), amended by 981 F.2d 1549 (9th Cir.1992).
 
 
 26
 In the insurance context, a primary carrier is entitled to recover interest from the date that it incurred expenses that exceeded its policy limit. Hartford Accident & Indemnity Co. v. Sequoia Ins. Co, 211 Cal.App.3d 1285, 1307 (1989). Here, Protective first incurred expenses that exceeded its policy limit of $500,000 on May 18, 1989, when it settled Kam's lawsuit on Pedus' behalf. Accordingly, Protective is entitled to prejudgment interest starting from May 18, 1989.[6]
 
 V.
 
 27
 In sum, we affirm the district court's holding on the defense costs issue. However, we reverse the district court's refusal to require Safety to pay prejudgment interest to Protective. We remand the case with instructions to the district court to calculate the prejudgment interest in a manner not inconsistent with this disposition.
 
 
 28
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 Protective's coverage was subject to a deductible of $25,000. That is, Pedus was responsible for the first $25,000 of any claim filed
 
 
 [2]
 An excess insurer's obligations arise after primary coverage has been exhausted. See Iolab Corp. v. Seaboard Sur. Co., No. 92-55642, slip op. at 955 (9th Cir. Jan. 28, 1994)
 
 
 [3]
 On March 21, 1989, the jury rendered a verdict in the amount of $484,627.00 against Pedus. Kam immediately filed a motion for a new trial on the ground that the jury award was insufficient. On May 18, 1989, Protective settled the suit for $500,000.00 in return for a waiver of the motion for a new trial
 
 
 [4]
 Safety's contract defines "Primary Limit" as the same amount as the "ultimate net loss." As we have already explained, the "ultimate net loss" in this case is $626,151.70
 
 
 [5]
 Rule 59(e) states:
 (e) Motion to Alter or Amend a Judgment. A motion to alter or amend the judgment shall be served not later than 10 days after entry of the Judgment.
 
 
 [6]
 The California courts calculate this interest at the rate of 10 percent per annum. See Cal.Civ.Code Sec. 3289 (West Supp.1993)